## Sweazy *v*. State of Indiana.

[No. 26,557. Filed May 22, 1936. Rehearing denied January 12, 1937.]

*Lawrence Huffman* and *Otto H. Krieg,* for appellant.

*Philip Lutz, Jr.,* Attorney-General, and *William E. Bussell,* Deputy Attorney-General, for the State.

Roll, C. J.—Appellant was charged by a grand jury

indictment for the crime of murder in the first degree. To this indictment appellant entered a plea of not guilty, and the cause was submitted to a jury for trial. A verdict of guilty was returned and judgment of life imprisonment was entered upon the verdict. Appellant's motion for a new trial was overruled and this appeal followed.

The only error assigned for reversal is the overruling of a motion for a new trial. The particular grounds relied upon for a new trial are (1) the verdict of the jury is contrary to law, and (2) the verdict of the jury is not sustained by sufficient evidence. The 3rd, 4th, 5th, 6th, 7th, and 8th causes for a new trial relate to the admission in evidence of certain testimony over the objection and exception of appellant, but these errors are not discussed in appellant's brief and are therefore waived.

The only error properly presented calls in question the sufficiency of the evidence to support the verdict. This alleged error makes it necessary for us to set out in substance the evidence upon which appellant was convicted. In considering the sufficiency of the evidence to support the verdict this court will consider only the evidence most favorable to the state. We will not weigh the evidence, but if there is substanial evidence to prove every material element of the crime charged, the verdict will not be disturbed on appeal. *Luther* v. *State* (1912), 177 Ind. 619, 98 N. E. 640; *Barry* v. *State* (1918), 187 Ind. 49, 118 N. E. 309; *Carlin* v. *State* (1933), 204 Ind. 644, 184 N. E. 543.

We have read appellant's narration of the evidence as set out in his brief, and have also read the evidence as appears in the record, and we find the following facts to be proven at the trial.

Appellant was about fifty years of age at the time of the alleged crime. He was a widower with no children,

and his wife died about two years prior to the commission of the alleged crime. When appellant was about six or seven years of age he was placed in an orphanage, but after about three years was placed in a home near Lafayette, Indiana, but after two or three months was returned to the orphanage. Later he was taken to the home of Arthur D. Groniger, where he stayed until he was past twenty years of age. He was not adopted by Mr. Groniger, but apparently appellant recognized him as a godfather. After appellant left the Groniger home he worked at various places, and later married and apparently lived with his wife until her death. After the death of his wife, he again returned to the Groniger home, where he did odd jobs, but did no work of any consequence.

In December, 1933, Mrs. Groniger, the wife of Arthur D. Groniger, became ill, and on the last Saturday in December, 1933, Mabel Capes came to the Groniger home to work and help care for Mrs. Groniger. Mabel Capes was mentally deficient, but not so much so but what she could do house work. She was the oldest daughter of Mr. and Mrs. Ed Capes, who lived on a farm some 3½ miles southwest of the Groniger home.

Appellant had become acquainted with Mabel Capes in September, 1933, and had seen her three or four times between September and the last Saturday in December, 1933. Appellant became infatuated with Mabel Capes, and their conduct became such that Mr. Groniger dispensed with Mabel's services after about two weeks. After Mabel returned home appellant called at the Capes home on several occasions. As soon as Mr. and Mrs. Ed Capes, father and mother of Mabel, discovered that appellant wanted to marry Mabel they objected to him coming to their home and objected to appellant keeping company with Mabel. Appellant insisted on coming to the Capes home, claiming that Mabel was his

common law wife. At various times Mr. and Mrs. Capes told Mabel, in the presence of appellant, that if she loved appellant and wanted to marry him she could do so, but that they couldn't live at the Capes home. Mabel told appellant on various occasions that she did not love him any more, and did not want to have anything to do with him, and desired that he stay away from her and leave her alone. Notwithstanding the protests of Mr. and Mrs. Capes and also Mabel, appellant insisted on coming to the Capes home. At one time appellant was accompanied to the Capes home by the deputy sheriff, who, in the presence of the parents of Mabel and also in her presence, asked Mabel if she loved appellant and if she desired to marry him, and she replied that she did not. The deputy sheriff then requested appellant to stay away from the Capes home and leave Mabel alone.

Sometime in the latter part of February or the first part of March, 1934, appellant came to the Capes home about 7:30 in the evening and there was a long conversation lasting until after midnight between Mr. and Mrs. Capes, Mabel, and appellant. In this conversation appellant continually insisted that Mabel loved him and that she was his common law wife, and that Mabel go with him and be married by some person authorized to pronounce marriage ceremonies. Again Mr. and Mrs. Capes consented to the marriage if Mabel so desired, but Mabel refused and said that she did not want anything to do with him. Not until violence was threatened could Mr. and Mrs. Capes persuade appellant to leave their home.

Shortly afterwards, the appellant instituted a writ of habeas corpus in the Wabash Circuit Court against Mr. and Mrs. Capes, claiming that Mabel Capes was his common law wife and that she was being unlawfully restrained of her liberty by Mr. and Mrs. Capes, father and mother of Mabel. This petition was set for hearing

on the 10th day of April, 1934, and on that day Mr. and Mrs. Capes and Mabel, and Mr. Groniger and Lloyd Capes, a brother of Mabel Capes, appeared in the court room at Wabash, and a conference was held between these parties and appellant and the attorneys. The sheriff and the prosecuting attorney were present at this conference and again Mabel was asked by the prosecuting attorney if she had any affection for appellant and if she desired to marry him. This question was asked her repeatedly and each time she responded that she had no love whatever for him, and she did not want to have anything to do with him, and that she wanted him to stay away from her home and not bother her any more. The habeas corpus suit was then dismissed by appellant and the parties returned to their respective homes, appellant going to the home of Mr. Groniger. That evening about 9:00 appellant was seen walking in the direction of the Capes home with a shotgun under his arm. Sometime after appellant was seen walking in the direction of the Capes home someone was seen standing beside the fence just south of the Capes home, but the witnesses who saw this person were unable to say that it was appellant.

The next morning about 5:00 o'clock Mrs. Capes awoke and saw some sheep belonging to Mr. Capes in the front yard. Mr. and Mrs. Capes occupied the bedroom located in the southeast corner of the house on the ground floor. Mabel occupied a room upstairs. When Mrs. Capes observed the sheep in the front yard she and Mr. Capes got up and dressed, except putting on their shoes, and then went to the kitchen and there finished dressing. As soon as they had finished dressing, Mr. and Mrs. Capes both went out the back door of the kitchen, Mr. Capes going north and then east around the house to the front yard for the purpose of driving the sheep back into the barn lot. Mrs. Capes

went in a southwesterly direction to an outdoor toilet. When she stepped inside the toilet and closed the door she observed appellant in the toilet. He immediately attacked Mrs. Capes, striking her in the face several times, inflicting severe bruises about her forehead and eyes, and cutting her head and hand with a razor. She finally pushed the door outward and a shotgun which was held by appellant fell to the ground. Her screams attracted the attention of Mabel, who appeared on the scene about the time Mrs. Capes forced open the toilet door and emerged from the toilet. Mrs. Capes started to the back door leading to the southwest bedroom. Appellant picked up the shotgun and walked east and north of the house around to the front yard. Mrs. Capes went through the southwest bedroom into the southeast bedroom and there picked up a double-barrel shotgun which was standing in the northwest corner of the bedroom which she and Mr. Capes had occupied during the night. She took two shotgun shells off the dresser and loaded the gun. About this time Mr. Capes came in the front way and met Mrs. Capes in the parlor which was just immediately north of the bedroom. She handed Mr. Capes the shotgun and told him what had happened to her in the toilet. Mr. Capes told her to go and call the sheriff.

Mrs. Capes went west through the parlor to the bathroom and south through the bathroom to the southwest bedroom and out at the door where she had entered a few minutes before. As she came out of the house she met Mabel who had just come around the house screaming that appellant had killed daddy. Mrs. Capes told Mabel to run to Mr. Miller's house, which was a few rods south of the Capes home, and get a shotgun, that she was going to "Joe Haupert's who lived about twenty rods north to call the sheriff." Mrs. Capes went around the house to the north and then to the road and then

north toward the home of Joe Haupert. As she started north she saw Mabel going south toward the Miller home.

As to what happened in the Capes home after this no one testified except appellant. Mrs. Capes went to the Haupert home and Mr. Haupert was just dressing, he having heard a shotgun fire a few minutes before. Mr. Haupert and Mrs. Capes then went north to the home of Ernest Stewart and there the sheriff was called. The sheriff received the call to come to the Capes home at about 5:15 in the morning of April 11th.

The sheriff called his deputy and they went immediately to the Capes home, and when they arrived, they found several of the neighbors congregated in front of the Capes home. This was about 5:30 or 5:45 in the morning. The sheriff instructed the deputy sheriff to remain at the Capes home and to see that no one left while he proceeded north to the Stewart home where he talked with Mrs. Capes. Shortly thereafter he returned to the Capes home and he, with the deputy and Lloyd Capes and others of the neighborhood entered the Capes home from the rear kitchen door. They proceeded from the kitchen eastward into the dining room. Upon entering the dining room they found Mr. Capes' body lying near the west wall. Mr. Capes' head was about a foot from the wall and his feet extended northeastward. An examination of the body disclosed that he had been shot at close range with a shotgun just above the heart. An autopsy held later revealed that the aorta was practically severed from the heart. Many shot were taken from the wound and from the heart. A double-barrel shotgun was lying by his side and partly under the body with two empty shells in it. No furniture seemed to have been disturbed. The sheriff and his party proceeded eastward from the dining room into the living room and from the living room southward

through the parlor into the southeast bedroom. The southeast bedroom is separated from the parlor by a folding door composed of three parts. Two panels of the door were folded back toward the east, the first panel being closed. Upon entering the bedroom they discovered appellant lying to the west with his head in a northwesterly direction. A single-barrel shotgun was found lying just inside the parlor with a discharged shell in it. Appellant was apparently unconscious. An examination of his body disclosed that he had been shot with a shotgun, some of the shot entering his face and right arm, the right thumb, the right index finger, and perhaps other places on his right hand. It was discovered that a great many shot marks were found in the folding door between the bedroom and the parlor. Also apparently one load had been discharged into the back of a Morris chair which was sitting in the southeast corner of the parlor near the folding door where the shot marks were found. The markings on the door were some 3½ or 4 feet from the floor, indicating that two shots had been fired in that vicinity.

Appellant was taken to a hospital and it was discovered that one shot had entered the right eye. Some of the witnesses testified that appellant was not unconscious at the time he was found in the Capes home, and also there was testimony that noises were heard in the Capes home as if someone were walking before anyone entered the house. There apparently were no bruises of any kind upon the body of appellant other than the shot wounds.

A razor was picked up at the entrance of the toilet and identified as the razor owned by appellant. An empty shotgun shell was found in the front yard near a tree almost directly east of the north edge of the Capes home, and some 15 or 20 feet east of the northeast corner of the house. To the west some 125 feet from the

tree where the shell was found is a shed and a great number of shot were found in the east wall of the shed.

After appellant was taken to the hospital the sheriff talked with him concerning this trouble, and told appellant that Mr. Capes was dead. Appellant stated that when Mr. Capes fired at him it caused his gun to discharge. The sheriff commented in substance that such a story was improbable, and appellant remarked that he did not have to use that story.

Appellant testified in his own behalf, and his testimoney relative to the tragedy is as follows:

That he went to the Capes home on the morning of April 11th, arriving there about 5:00 in the morning; that his purpose in going to the Capes home was to get Mabel to go with him and secure a marriage license and get married as had been agreed upon between them some time before; that he went to the toilet in the rear of the house and while there Mrs. Capes came to the toilet, and as soon as she saw him she began to scream and he attempted to prevent her from screaming by placing his hand over her mouth; that she obtained possession of the shotgun and in the scuffle they forced the door open; that Mabel appeared upon the scene about this time and he and she walked around the north of the house toward the east, and when they got to the front yard Mabel began to scream and say that her father would kill both of them if he saw her talking to appellant; that Mr. Capes was driving the sheep into the barn-lot and came toward appellant and Mabel; that as he approached them appellant commanded Mr. Capes to stop; that Mr. Capes proceeded to approach appellant, whereupon appellant leveled his shotgun at Mr. Capes, but this did not cause Mr. Capes to stop. When Mr. Capes was within a few feet of appellant, he, appellant, dropped his shotgun and shut his fist and said to Mr. Capes that he would stop him, whereupon

Mr. Capes turned around with the remark, "Oh Hell," and proceeded toward the front door of the house. Appellant picked up his shotgun and again leveled it at Mr. Capes and told Mabel to get out of the way or she might get shot. Appellant testified that he shot into the air with the muzzle pointing upward; that Mabel followed her father into the house, and then he, appellant, decided to go home and started down the road. He stated that he heard Mabel screaming in the house, and decided that he could not leave her there and he must go back and get her. He went to the front of the house and then around the south side, intending to go in the kitchen door, but he saw the door leading into the south bedroom open and he went in at this door, proceeded through this bedroom to the door that opened into the parlor. There he stopped and saw Mr. and Mrs. Capes and Mabel standing near the doorway between the parlor and the living room. Mrs. Capes was holding the shotgun, and was trying to persuade Mr. Capes to take the shotgun and shoot appellant. Mr. Capes remarked that he did not desire to kill anyone, but finally yielded to the wishes of Mrs. Capes and told Mrs. Capes to go and call the sheriff. He then took the gun and shot at appellant. Appellant said he heard a very loud noise, and suddenly things became dark and he reeled and fell to the floor. He testified that during the time he was standing in the door, which was some five minutes, Mabel was screaming all the time and saying, "Daddy, Daddy, please don't."

Appellant's testimony in many places was in direct conflict with the testimony of other witnesses, and in determining whether or not the verdict is supported by sufficient evidence this court can only consider the evidence most favorable to the state. If the jury believed the testimony of Mrs. Capes, then there was no one inside the house at the time of the homicide except Mr.

Capes and appellant. The evidence is sufficient to establish the fact that Mr. Capes was killed instantaneously, and that it was improbable, considering the nature of his wounds, for Mr. Capes to have taken more than one or two steps after he was shot, and most likely fell the instant he was shot. The jury had the right to consider the fact that appellant had been repeatedly requested to stay away from the Capes home; that he went to the Capes home armed with a shotgun and razor; that soon after the Capes family arose on the morning of April 11th appellant and Mrs. Capes had an encounter in the toilet in which appellant inflicted serious wounds upon Mrs. Capes.

The evidence fairly establishes the fact that at the first opportunity appellant became embroiled in a controversy with Mr. Capes, and the testimony is such that the jury could very reasonably draw the inference that appellant shot at Mr. Capes while in the front yard. An empty shell was found near a tree situated in the northeast corner of the front yard, and shot was found in a shed about 125 yards west of this tree. Appellant afterwards went into the house with a loaded shotgun and shortly thereafter Mr. Capes was killed.

The evidence and circumstances and the surroundings as disclosed by the record presented questions of fact for the jury and in our judgment they were sufficient to justify the jury in finding that appellant murdered Mr. Ed Capes. While there were no eye witnesses to the actual shooting, yet it was for the jury to decide from all the facts and circumstances whether or not appellant was guilty of the crime charged. We think the evidence sufficient to sustain the verdict.

Appellant in his brief states several abstract propositions of law, and cites some authorities to sustain them, to the effect that where two persons in a sudden quarrel engage in mutual combat, if either one, in the

heat of it, kills the other, though with a deadly weapon, his offense is ordinarily only manslaughter. The other proposition relates to self defense, and the right to use force when being attacked.

Appellant makes no complaint of the instructions given to the jury, and no assignment of error is predicated upon any of the instructions. We assume, therefore, that the jury was properly instructed on all phases of the law touching the facts of the case.

Having determined that the evidence is sufficient to support the verdict, and this being the only point presented by the appellant in his brief, the judgment below is affirmed.

## ON REHEARING.

ROLL, J.—Appellant insists that his brief is sufficient to present the question raised by his third, fourth, fifth, sixth, seventh, and eighth reasons for a new trial. These reasons relate to evidence offered by the state in rebuttal and admitted by the court over the objection of appellant, that the general reputation of the deceased for peace and quietude in the neighborhood where he lived at the time of the alleged homicide, was good.

Appellant contends that such evidence is inadmissible without his consent.

We think the evidence competent and material. Appellant testified in his own behalf and claimed that the deceased made an attack upon him. That he was standing in the doorway with his gun standing beside him, and as soon as the deceased observed his presence, he made the remark, "There is the s of b" and raised his gun and shot appellant. This is a direct attack upon the character of the deceased and put his reputation for peace and quietude in issue. While appellant's defense was not self defense, yet he charged the deceased as

being the aggressor and making the assault upon him. There is evidence in the record that appellant and the deceased were the only persons in the house at the time of the alleged crime. It was a question for the jury to determine whether appellant was guilty of the crime charged. One of the questions the jury had to determine was whether the deceased made the attack upon appellant as testified to by appellant. It was said in the case of *Thrawley* v. *State* (1899), 153 Ind. 375-383, 55 N. E. 95:

> "But in negation of appellant's evidence tending to show that deceased was the only person in fault, it is claimed that deceased's character for peace can not be considered without appellant's consent. If, in determining the question, Was appellant in fault? his good character for peace would be evidence of such quality as to be admissible as disproof, so deceased's good character for peace was evidence of such quality as to be admissible as disproof of the charge against him. The character for peace of each of them was presumed to be good in the absence of evidence. But the evidence of the State in support of the charge against appellant was such an attack upon his character for peace as to authorize him to introduce his good character as a substantive fact, involved in the transaction, in disproof of the charge, without the State's consent. So the evidence of appellant in support of the charge against deceased was such an attack upon his character for peace as to authorize the State to introduce his good character as a substantive fact, involved in the transaction, in disproof of the charge, without appellant's consent."

The court further said (p. 385):

> "However, in the case of *Fields* v. *State* (1892), 134 Ind. 46, the record shows that the defense offered no impeaching testimony to attack the character of the deceased for peacableness. Defendant claimed that the killing was done in self-defense in mutual combat. On rebuttal the State introduced reputation witnesses to prove the good character of the deceased for peacableness. Fields squarely

raised the very question presented by Thrawley; and the court said: 'The defendant testified that the deceased assaulted him and that he apprehended great injury to life or limb from the assault. On rebuttal the court permitted the State to prove that the deceased was a peaceable, quiet man. This was not erroneous.' "

We think the fact that appellant did not admit that he killed the deceased, and claim that the killing was done in self-defense does not change the rule under the facts in this case. We think the reason for the rule holding such evidence competent in the above cited cases, applies to the facts in this case. There was no error in the admission of this evidence.

Motion for a rehearing denied.